# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7483 | **DATE** | 9/25/2002 |
| **CASE TITLE** | Proin S.A. vs. LaSalle Bank, N.A. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing set for 10/8/2002 at 9:45 A.M..
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for summary judgment [65-1] is granted. Defendant's motion for summary judgment [60-1] is denied. Judgment is entered in favor of the plaintiff and against the defendant on Count I as to liability only. A final pretrial order to be filed on or before 10/7/02.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | SEP 2 6 2002 | 74 |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT CLERK | date mailed notice | |
| RO | courtroom deputy's initials | 02 SEP 25 PM 4:36 | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PROIN S.A., )
)
    Plaintiff, )
) No. 01 C 7483
)
) Judge Ruben Castillo
v. )
)
LASALLE BANK, N.A., )
)
    Defendant. )

DOCKETED
SEP 2 6 2002

## MEMORANDUM OPINION AND ORDER

Plaintiff Proin S.A. ("Proin") sued defendant LaSalle Bank, N.A. ("LaSalle") alleging breach of contract and violations of the Uniform Commercial Code ("UCC") arising out of a document collection handled by LaSalle. LaSalle asserted a counterclaim for conversion and Proin responded with a counterclaim alleging additional UCC violations. The parties filed cross-motions for summary judgment on the breach of contract claim. For the reasons set out herein, we grant Proin's motion as to liability on the breach of contract claim but reserve any damages determination pending the resolution of the remaining claims. (R. 60-1; R. 65-1.)

### RELEVANT FACTS

Proin, an Argentinian company, entered into a contract with Foods Unlimited, Inc., an Illinois corporation, to supply fruit juice and juice concentrate. In order to facilitate the international transaction, Proin initiated a documentary collection through its bank, Banco de la

74

Nación Argentina. According to the Uniform Rules for Collection ("URC 522") Article 2(d)[1], a "documentary collection" is a collection of (i) financial documents accompanied by commercial documents or (ii) commercial documents not accompanied by financial documents. (R. 66, Pl.'s Facts ¶ 5.) On or about September 7, 2000, Proin submitted to LaSalle Bank in Chicago commercial documents giving control over the shipment of fruit juice, the bills of exchange drawn on Foods Unlimited, and the collection instructions. (*Id.* at ¶¶ 13-14.) LaSalle had previously extended a loan to Foods Unlimited and had a continuing banking relationship with the company.

Proin's collection instructions to LaSalle, which were written in both English and Spanish, contained the following five sentences:

INSTRUCCIONES/INSTRUCTIONS:

Deberan entregar la documentación contra la aceptación de las letras por parte de FOODS UNLIMITED INC. y el aval de LASALLE BANK N.A. 135 SOUTH LASALLE STREET CHICAGO, ILLINOIS 60603

You must deliver the documents against acceptance by Foods Unlimited, Inc. And your endorsement.

Avisar por falta de aceptacion/firma/aval por swift.

Rogamos nos acrediten en la Cuenta Corriente No. 0000000117006 que montenemos con nuestra Banco de la Nación Argentina New York, U.S.A. de acuerdo al siguiente detalle:
    Al 15/09/00 la suma de USD 108.000
    Al 30/09/00 la suma de USD 108.000
    Al 10/10/00 la suma de USD 108.000

---

[1] The International Chamber of Commerce promulgates Uniform Rules for Collections. URC 522 sets forth a code of practice which is recognized by banking communities in a vast number of countries. In this case, the parties agree that their contract incorporated by reference the rules in URC 522.

<pre>
    Al 20/10/00 la suma de USD 108.000
    Al 30/10/00 la suma de USD  98.000
</pre>

<pre>
    COBRANZA SUJETA A REGLAS Y USOS UNIFORMES PARA
    GESTIÓN DE COBRANZAS (REV. 1995) ICC Nro. 522
</pre>

(R. 61, Def.'s Facts, Ex. C, Collection Instructions.)

Susan Garcia, a trade services representative for LaSalle, reviewed and processed the document collection. Even though Garcia had some knowledge of Spanish and could understand some Spanish words, she did not attempt to read the portions of the collection instructions written in Spanish. (R. 66, Pl.'s Facts ¶ 28.) Had Garcia read the Spanish portions, however, she would have seen the word aval, which she knew meant guaranty. (*Id.*, Ex. 12, Garcia Dep.) LaSalle trains employees in its trade services department to anticipate that a documentary collection may include instructions to release documents against acceptance and aval. (*Id.* at ¶ 8.) LaSalle also, however, informs its employees that banking regulations do not allow United States banks to guarantee third party obligations.[2] (R. 61, Def.'s Facts, Ex. A, Baker Dep.) LaSalle's training materials also provide that "[i]n case your aval is required and the drawee is not a customer of yours you should consult . . . the drawee in order to determine whether or not this guarantee can be given. If not, you should contact the remitting party, giving the name of the drawee's bankers." (R. 66, Pl.'s Facts, Ex. 4, Training Materials.)

---

[2] It is disputed whether LaSalle's procedures provide for guaranteeing bills of exchange. LaSalle's training manual notes that an "aval" is the bank's guaranty that the bills of exchange accepted by the buyer will be paid. LaSalle asserts, however, that this manual was promulgated by ABN-Amro, LaSalle's parent company, for worldwide distribution subject to modification by individual bank practices. LaSalle claims that its practice was to refrain from avalizing bills of exchange but it does not dispute that its training materials define and describe the aval requirements.

Garcia also did not attempt to obtain a translation of the Spanish portions of the instructions. (*Id.*, Ex. 12, Garcia Dep.) Whether LaSalle policy requires translation of all foreign-language documents is disputed. In January 1999 LaSalle's trade services department issued a written statement of practice regarding the procedures to be used when translating documents. (*Id.*, Ex. 7, Statement of Practice.) According to the policy, trade services representatives handling documentary collections must obtain an accurate translation of the document before signing it. (*Id.*) LaSalle contends that this practice only applies when the bank receives documents written entirely in a foreign language; when the bank receives a document in Spanish with an English form underneath, it relies on the English version and does not translate the document. (R. 61, Def.'s Facts, Ex. B., Hildreth Dep.) Garcia testified that because the instructions were written in both languages she focused only on the portions written in English. When she read the sentences "You must deliver the documents against acceptance by Foods Unlimited, Inc. And your endorsement" (hereinafter the "endorsement sentence"), she assumed that Proin was seeking an endorsement only if the documents were consigned to LaSalle. (*Id.* at ¶ 6.) When she discovered that they were not, she concluded that the endorsement instructions did not apply to LaSalle. (*Id.*) The term "endorsement" has several meanings in the documentary collection process, and does not always create an obligation on the part of the endorser. (R. 68, Def.'s Add'l Facts ¶ 4.) Garcia was never told that there is a definition of endorsement that means guaranty. Nevertheless, she did know what an "aval" was and would have known that she was supposed to guarantee the documents if she had noticed the word "aval" in the collection instructions. (R. 66, Pl.'s Facts, Ex. 12, Garcia Dep.) Victoria Hildreth, Garcia's supervisor, also reviewed the document collection and approved it for release to Foods

Unlimited. (*Id.* at ¶ 32.) Hildreth did not notice the word "aval" in the collection instructions at that time, nor did she notice the endorsement sentence. (*Id.*, Ex. 10, Hildreth Dep.)

As a result, LaSalle did not add its aval or guaranty to the bills of exchange. On September 12, 2000, Garcia sent a message to Banco Nación acknowledging receipt of the collection documents and thereby confirming that LaSalle would follow the collection instructions. (*Id.* at ¶ 21.) On September 15, Garcia sent a swift message to Banco Nación advising it that Foods Unlimited had accepted the terms of the collection. (R. 61, Def.'s Facts ¶ 10.) She then notified Foods Unlimited that Banco Nación was aware of its acceptance. (*Id.*) Foods Unlimited failed to pay any of the bills of exchange on their due dates. (R. 66, Pl.'s Facts ¶ 25.) After Banco Nación made inquiries about the status of the collection, Hildreth again reviewed the instructions and this time noticed the words "aval" and "endorsement." (*Id.* at ¶ 33.) After the fact Hildreth was able to determine that the Spanish-language potion of the instructions were different from the English-language portion. (*Id.*, Ex. 10, Hildreth Dep.) After she read the Spanish portion of the contract, there was no question in her mind that "and your endorsement" meant "guarantee payment." (*Id.*)

Proin filed suit in September 2001, alleging breach of contract and lack of ordinary care in handling the documentary collection in violation of the Illinois statutory equivalent of the UCC, 810 ILCS 5/4-103(e). LaSalle, who had retained a security interest and lien on Food Unlimited's property after it defaulted on its loan, counterclaimed against Proin for common law conversion arising from Proin's retention of Food Unlimited's security deposit. Proin responded with its own counterclaim for violation of Illinois Commercial Code Section 5/9-404(a), which permits an account debtor to make claim against an assignee for recoupment. *See* 810 ILCS 5/9-

5

404(a). Presently before the Court are the parties' cross motions for summary judgment on the breach of contract claim.

## LEGAL STANDARDS

Summary judgment is proper only when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When, as here, cross-motions for summary judgment are filed, we look to the burden of proof that each party would bear on an issue at trial; we then require that party to go beyond the pleadings and affirmatively establish a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

## ANALYSIS

In this case, LaSalle argues that it did not breach the collection instructions because it handled the collection as directed by the English-language translation provided by Proin. According to LaSalle, the English translation clearly and unambiguously asks for an endorsement, not a guaranty, and thus its handling of the collection instructions was not in error. LaSalle further argues that even if the Court holds that the instructions are ambiguous or that LaSalle's interpretation of the instructions was erroneous, Proin still loses because URC 522

holds Proin responsible for any ambiguities, errors in translation, or misinterpretation of the instructions.[3]

Proin responds that LaSalle trains its employees to anticipate a possible aval. LaSalle policy also requires translations of documents written in a foreign language. According to Proin, it is clear that the English-language portions of the instructions did not constitute a full translation. Of the five sentences contained within the collection instructions, only one of them is in English. Proin attached a full English translation of the instructions to its motion and argues that the translated version unambiguously requires LaSalle to aval or guarantee the bills of exchange.[4] Moreover, Proin argues, the endorsement sentence unambiguously requires LaSalle's guaranty because a common translation of "aval" is "endorsement."

Placing contract interpretation aside for a moment, there is a threshold question in this case that the parties did not explicitly address—namely, whether LaSalle had a responsibility to fully read and translate the document before signing it. We believe the answer to that question is yes, and that therefore LaSalle is accountable for any failure to comply with the instruction terms.

---

[3] Under URC 522, Article 4(b) states that "[i]t is the responsibility of the party preparing the collection instruction to ensure that the terms for the delivery are clearly and unambiguously stated, otherwise banks will not be responsible for any consequences arising therefrom." Furthermore, Article 14(a) provides that "[b]anks assume no liability or responsibility for the consequences arising out of . . . error(s) in translation and/or interpretation of technical terms."

[4] Proin provided a full, certified English translation of the collection instructions as an attachment to its summary judgment motion. According to this translation, the collection instructions state: INSTRUCTIONS: You must deliver the documents against acceptance of the letters by FOODS UNLIMITED, INC. and the aval of LASALLE BANK N.A., 135 SOUTH LASALLE STREET, CHICAGO, ILLINOIS 60603. Advise by swift no acceptance/signature/aval. Please credit the current account NO. 000000117006 that we maintain with Banco de la Nacion Argentina, New York, USA as per the following detail: [listing amounts due and due dates]. COLLECTION SUBJECT TO UNIFORM RULES AND PRACTICES FOR COLLECTION PROCESSING (REV. 1995) ICC No. 522.

"[I]t is a fundamental principle of contract law that a person who signs a contract is presumed to know its terms and consents to be bound by them." *Paper Express, Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992). In *Paper Express*, the plaintiff signed a contract where portions were written in German, a language that the plaintiff did not understand. The court noted that this fact did not preclude enforcement of the contract because "mere ignorance will not relieve a party of her obligations." *Id.* at 757. The court further observed that "[w]e live in a global economy and contracts between parties of different nationalities and speaking different languages are commonplace." *Id.* Thus, a party who agrees to terms in writing without understanding or investigating them does so at his own peril. *See also MCC-Marble Ceramic Ctr., Inc. v. Ceramica Nuova D'Agostino, S.P.A.*, 144 F.3d 1384, 1387 n.9 (11th Cir. 1998) (plaintiff's representative did not read or speak Italian when he signed the contract written in Italian. Court found it "astounding" that any individual "purportedly experienced in commercial matters, would sign a contract in a foreign language and expect not to be bound simply because he could not comprehend its terms."); *Elite Parfums, Ltd. v. Rivera*, 872 F. Supp. 1269, 1273 (S.D.N.Y. 1995) ("a businessman acting in a commercial context, is held to have understood the consequences of his having signed [contracts] . . . . If [he] did not read them or hire counsel to do so, he is the victim of his own lack of diligence, not plaintiff's misconduct.") (quoting *Leasing Serv. Corp. v. Graham*, 646 F. Supp. 1410, 1415 (S.D.N.Y. 1986)); *Albers v. Sullivan*, 5 N.E.2d 253, 256 (Ill. App. Ct. 1936) (party has a duty to read terms of the contract before signing it). The principles enunciated by the Seventh Circuit in *Paper Express* a decade ago are more compelling in the 21st century. LaSalle simply cannot dodge contractual liability by failing to properly evaluate contractual language that it fully accepted without modification or reservation.

8

Both Garcia and Hildreth admit that they did not read the contract in its entirety before signing it. In fact, Garcia insists that she did not even skim the Spanish-language portions, even though she speaks and understands some Spanish. Garcia claims that the reason she did not do so was because she assumed that the English portions were a full translation of the contract. We reject LaSalle's theory that the endorsement sentence was a complete translation of the collection instructions. It is clear from even the most cursory glance at the document that the single English sentence embedded within four other Spanish sentences is not a complete translation of the collection instructions. For example, the sentence immediately following the endorsement sentence stated in Spanish "Avisar por falta de acceptación/firma/aval por swift." There was no English translation accompanying this instruction. Similarly, the amount and due dates for each payment was written in Spanish with no English translation. LaSalle agreed to follow the collection instructions when it signed the bill of exchange, but those instructions could not be followed when in practice LaSalle permits its employees to disregard entire contractual terms so long as some, but not all, of the contract terms are translated into English.[5]

---

[5] The cases offered by LaSalle are inapposite. In *Tippecanoe Beverages, Inc. v. S.A. El Aguila Brewing Co.*, 833 F.2d 633 (7th Cir. 1987), the court held that oral assurances given prior to the written contract trumped the fine print of a Spanish-language contract. Thus, buyer who had paid for shipment by cashier's check (as instructed verbally by distributor and agent of seller) instead of by letter of credit (as required by the contract) nevertheless could recoup his money after the distributor absconded with the money. Significantly, the court noted that it agreed with the general proposition that one who signs a contract in a language that he does not understand acts at his peril but held that in this case it would not have made any difference because distributor would have reiterated his instructions in furtherance of his theft and conversion. *Id.* at 637. In *Tunick v. Kornfeld*, 813 F. Supp. 988 (S.D.N.Y. 1993), the court held that when the English version of contract contained different terms than the German version, the English translation would control. But this appears to be a case in which the plaintiff was given only the English version and thus did not have occasion or opportunity to compare and/or translate the foreign-language version.

LaSalle's argument that it was not required to translate the collection instructions is equally unavailing. LaSalle issued a policy statement in January 1999 requiring translation of foreign language documents. Victoria Hildreth testified at her deposition that when she receives an instruction that has both English and Spanish, she does not obtain translations of that portion written in Spanish if the drafters have included the English form underneath. But Hildreth did not answer the question of what LaSalle does when it encounters a contract like the one in this case—namely, one in which some portions are translated into English and other portions are not. This Court has already held that the document that Proin sent to LaSalle was not fully translated and that LaSalle agreed to follow the collection instructions when it signed the bill of exchange. The fact that portions of the instructions were written in a foreign language does not nullify LaSalle's duty to translate, read, and follow them. Furthermore, we specifically note that the word "aval" is a term of art that needs no translation in this specific industry. *See* note 7, *infra*. Anyone using ordinary care in the industry would have instantly recognized the significance of the word "aval" as it appeared in the collection instructions.

Even if we were to reach the question whether Proin's use of the term "endorsement" clearly and unambiguously required LaSalle to guarantee the bills of exchange, we would still rule in favor of Proin. Issues of contract interpretation are ordinarily questions of law for the Court. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998). If a contract is unambiguous, by definition no material issues of fact exist regarding the contract's interpretation and that interpretation is a question of law for the court. But if the contract is ambiguous, the court must determine, after consideration of extrinsic evidence, whether there are any triable issues of fact. If the undisputed extrinsic evidence conclusively establishes the intent of the

contract, summary judgment is proper.[6] *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1389 (7th Cir. 1993); *see also Collins v. Ralston Purina Co.*, 147 F.3d 592, 598-99 (7th Cir. 1998); *Tranchitella v. Bank of Ill.*, 199 B.R. 658, 664 (N.D. Ill. 1996). In determining whether the endorsement sentence raises an ambiguity, this court examines the contract as a whole, and attempts to give meaning and effect to each provision in the contract. *See Echo, Inc. v. Whitson Co., Inc.*, 121 F.3d 1099, 1105 (7th Cir. 1997) (*citing Schiro v. W.E. Gould & Co.*, 165 N.E.2d 286, 289 (1960)). We construe any ambiguity against the drafter. *Bourke*, 159 F.3d at 1036. Contractual terms are ambiguous if they are reasonably susceptible to more than one meaning, but contract language is not rendered ambiguous merely because the parties do not agree upon its meaning. *Id.*

Whether we view the instructions in their original form (*i.e.*, mixed Spanish and English) or in their fully translated form, we conclude that there is no contractual ambiguity because the word "aval," which is contained in the sentences immediately before and after the "endorsement sentence," clearly indicates that LaSalle was required to guarantee the bills of exchange, or at the very least advise Proin that it would not guarantee the bills, before releasing them to Foods Unlimited. It therefore makes no difference whether "endorsement" meant guaranty, as Proin argues, or merely required signature for consignment, as LaSalle argues, because other contractual language alerted LaSalle to the fact that a guaranty was required. Both Garcia and

---

[6] LaSalle argues that because Article 4(a) of URC 522 requires the drafting party to ensure that the terms of the collection instructions are clearly and unambiguously stated, as soon as the Court discovers an ambiguity in the contract, it must hold Proin liable without independently resolving the ambiguity or referring to extrinsic evidence. The URC may govern the parties' conduct, but it does not displace this Court's province and duty to interpret contracts. *Perry v. Community Action Servs.*, 82 F. Supp. 892, 896 (N.D. Ill. 2000) (contract interpretation is a question of law for the court).

11

Hildreth knew that "aval" meant guaranty and had they read the entire contract before releasing the bills of exchange, they would have known what the contract terms required. Alleging that the term "endorsement" is ambiguous does not alter this result.[7]

## CONCLUSION

We conclude that the undisputed facts require us to grant Proin's motion for summary judgment, (R. 65-1), and deny LaSalle's motion for summary judgment, (R. 60-1). We hereby enter judgment on liability on Count I. We reserve any determination of damages until the final resolution of all the parties' claims at trial.

As previously set on July 23, 2002, this lawsuit will proceed to trial on October 15, 2002 at 10:00 a.m. A final pretrial order, with proposed findings of fact and conclusions of law will be due on October 7, 2002. The parties should, of course, exhaust all remaining settlement possibilities for this lawsuit. This Court will hold a status hearing on October 8, 2002 at 9:45 a.m.

---

[7] Even if we were to look to extrinsic evidence, we would find that "aval," "guaranty" and "endorsement" could be synonymous in this contract. The definitions of endorsement and aval that the parties attached to their motions, as well as our own independent inquiry, establish that "aval" is both a French and Spanish word that has evolved into a term of art in the trade and banking industries. *See, e.g., Finanz AG Zurich v. Banco Economico, S.A.*, 192 F.3d 240, 242 (2d Cir. 1999); *A.I. Trade Fin. v. Petra Bank*, 989 F.2d 76, 78 n.2 (2d Cir. 1993) (noting that the French word "aval" is a commercial term meaning "backing" or "endorsement" and has become through custom and practice a "fully articulated contractual obligation"); *Fr. Winkler KG v. Stoller*, 839 F.2d 1002, 1009 (3d Cir. 1988) (noting that "por aval" is "a customary term used in Latin America to denote an unconditional guaranty under which the avalor is obliged to pay the debt obligation as if it were the primary debtor."). French-English dictionaries define aval as "endorsement" or "backing" while Spanish-English dictionaries variously define aval as "guarantee, "endorsement," "guarantee by endorsement" and "underwrite." Black's Law Dictionary defines aval as "the guaranty of a bill of exchange." *Black's Law Dictionary* 135 (6th ed. 1990).

ENTERED:

*[signature]*

**Judge Ruben Castillo**
**United States District Court**

**Dated: September 25, 2002**